# EXHIBIT A

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

IN RE APPLICATION OF:          )
                               )
DAVID GOTHARD                  )
                               )
SERIAL NO.   09/500,284        )
                               )          GROUP ART UNIT NO. 2736
FILED:       FEBRUARY 8, 2000  )
                               )
TITLE:       REMOTE CONTROL    )
             ELECTRONIC DISPLAY)
             SYSTEM            )
                               )
EXAMINER:    JULIE LIEU        )

AMENDMENT B

Commissioner of Patents
   and Trademarks
Washington, D.C. 20231

Sir:

    Responsive to the official communication dated May 22, 2000,
please amend the above-entitled application as follows:


IN THE CLAIMS

    Please amend Claims 1, 4, 5, 6, 9,10, 12, 19, 23-25 and 33 as
indicated on the following pages.

    Claims 2, 3, 7, 8 and 11, 13-17, 20, 22, 26-29 are resubmitted
and are re-presented herein for the convenience of the U.S. Patent
and Trademark Office.

    Claims 30-32 stand allowed.

    Please cancel Claim 21.

1 (Twice Amended)

A display system for generating at a remote source a static non-continuous display in the form of individual fixed images for presentation on a display sign at a generally fixed location and which is electronically transmitted from the remote source to the display sign, said display system comprising:

    a)   display generating means at the remote source for generating a plurality of displays in the form of electronic signals capable of being transmitted;

   [b)  a readily transportable display sign positionable at a fixed location for operation at that fixed location and which may be located at a substantial distance from the display generating means, said display sign having an electronically operable flat panel display member for displaying of advertising and other information to a group of people simultaneously at a public facility;

   c)   self-contained and dedicated computer operated processing means in said display sign for generating a static display from the signals generated at and transmitted from the remote source; and]

[d)] b)   means for transmitting electronic signals representative of the plurality of displays from the remote source to the [processing means at the] display sign; and [allowing the electronic signals

2



to be reconverted to visible images which are statically displayed one at a time at the display sign enabling advertising and other information to be presented for promotion of products or services on a large screen format.]

c) a readily transportable and completely self-contained display sign positionable at a generally fixed location for operation at that fixed location and which may be located at a substantial distance from the display generating means, said displays sign being operable as a self-contained unit independently of any networking for generation of displays, said display sign comprising:

1) an electronically operable flat panel display with wide angle viewing almost independent of angle of view by an individual for displaying of advertising and other information to a large group of people simultaneously at a public facility;

2) self-contained and dedicated computer operated processing means in said display sign for generating a static display from the electronic signals;

3) memory means in said display sign forming part of said processing means and storing information delivered from the remote source

3

in digital signal format as digital signals
and allowing the digital signals to be
reconverted to visible images which are
statically displayed one at a time at the
display sign enabling advertising and other
information to be presented for promotion of
products or services on a large screen format,
and where a large number of different displays
stored in said memory means can be displayed
on time selected basis independently of the
electronic signals from the display generating
means.

2 (Resubmitted)

The display system of Claim 1 further characterized in that
the electronic signals are transmitted from the remote source to
the processing means through an electrical conductor.

3 (Resubmitted)

The display system of Claim 1 further characterized in that
the electronic signals are transmitted from the remote source to
the processing means through a wireless transmission means.

(Twice Amended)

The display system of Claim 1 further characterized in that
said system comprises means in said display sign for sequencing a

4

plurality of sequential displays which are generated at said remote source and transmitted to said display sign and which are re-generated from the stored digital signals and displayed at the display sign.

5 (Twice Amended)

The display system of Claim [4] 1 further characterized in that said system comprises [storage] means [at the remote site] in the display sign and associated with the processing means for holding a plurality of displays in the form of [electronic] digital signals for ultimate [transmission to] presentation on said display [sign] member and presentation of said displays at any of the predescribed time periods.

6 (Twice Amended)

A method for generating a plurality of individual static displays at a remote source and electronically transmitting the displays to a readily transportable display sign located at a substantial distance from the remote source for presentation, said method comprising:

a) electronically generating a plurality of displays at a remote source with each in the form of a visual image;

b) converting the visual image to corresponding electronic signals at the remote site;

c) temporarily storing the electronic signals in a temporary storage at the remote site for potential further processing;

d) permanently storing the electronic signals at a permanent storage at the remote source for ultimate transmission to the display sign;

e) transmitting the electronic signals to a self-contained and dedicated computer processing means at the display sign and located in the display sign;

f) storing the fixed and non-continuous images of the displays in the form of digital signals in a memory means forming part of said [at a] processing means forming part of the display sign;

6

g)   positioning the display sign at a fixed location
for operation at that fixed location for a display
of advertising  and other information to a group of
people simultaneously at a public facility[.] ,
without need for electronic signal networking, such
that the display sign operates as a self-contained
and stand alone unit;

h)   re-generating the display from the [electronic
signal] digital signals and statically displaying
same on the display sign; and

i)   automatically controlling at the display sign the
time of each display and the particular display
which is regenerated at the display sign enabling
the advertising and other information to be
presented for promotion of products and services on
a large screen format.


7 (Resubmitted)

The method for generating the display of Claim 6 further
characterized in that the method comprises transmitting the
electronic signals from the remote source to the display sign
through an electrical conductor.


8 (Resubmitted)

The method for generating the display of Claim 6 further
characterized in that the method comprises transmitting the

electronic signals from the remote source to the display sign through wireless transmission means.

---

9 (Twice Amended)

The method for generating the display of Claim 6 further characterized in that the method comprises sequentially transmitting said plurality of displays from said remote source to said display sign and storing the digital signals at said memory means in said display sign, and providing display generating signals at said processor means for sequentially displaying said individual displays.

20 (Twice Amended)

A display generating system for generating a static non-continuous display in electronic format and in the form of fixed images at a source remote to and transmitting same to a display sign for display on said display sign, said system comprising:

a)    scanner means at the remote source for scanning a previously prepared image and providing temporary image signal;

b)    a temporary storage means for receiving and temporarily holding said temporary image signal;

c)    keyboard means for introducing and receiving in said temporary storage means keyboard input signals to modify or add to the temporary image signal;

d)    computer assist design means for receiving said temporary image signal and keyboard input signals and thereby processing and editing same in a predetermined format to provide electronic signals representative of a display;

e)    permanent storage means at said display sign for receiving and holding said electronic signals so that said electronic signals which are fully processed can be later recreated into a display;

f)    a readily transportable self-contained and stand alone display sign positionable at a fixed location for operation at that fixed location and which may be located at a substantial distance from the

9

display generating means, said display sign having an electronically operable plasma operated flat panel display member which is back light for displaying of advertising and other information with high density resolution to a large group of people simultaneously [at a public facility] with wide angle viewing almost independently of angle of view by an individual;

g) self-contained and dedicated computer operated processing means in said display sign for generating a static display from the signals generated at and transmitted from the remote source; and

h) means for transmitting electronic signals representative of the plurality of displays from the remote source to the processing means at the display sign and allowing the electronic signals to be reconverted to visible images which are statically displayed one at a time at the display sign enabling advertising and information to be presented for promotion of products or services on a large screen format and without need of any electronic networking for generation of the displays.

11 (Resubmitted)

The display generating system of Claim 10 further characterized in that said system comprises editing means operating in conjunction with said computer assist design means.

12 (Twice Amended)

A display sign capable of generating a static non-continuous display from a received electronic signal generated at and transmitted to said sign from a remote source, said display sign comprising:

a) a relatively transportable outer housing having an interior compartment and being constructed for operation at a fixed location;

b) a relatively thin plasma operated flat high definition display panel on said housing and being observable simultaneously to a group of viewers;



c) a self-contained dedicated computer processor means within the interior compartment of said housing and receiving electronic signals from a remote source representative of the sequential displays to be generated, said processor means causing generation of sequentially displayable static displays in the display panel based on the signals received from the remote source for display of advertising and other information for promotion of products and services;

d) means on the exterior of said display housing to mount the housing to a fixed support without placing undue stress on the display panel;

e) a power supply means located in the interior compartment of said housing for operating said

12

processing means and operating other electrically
operable components in said housing; and

f)   ventilation means for causing an air flow through
the housing to enable dissipation of heat
generation in said housing.

### 13 (Resubmitted)

The display sign of Claim 12 further characterized in that
said display panel is a plasma operated display panel.

### 14 (Resubmitted)

The display sign of Claim 12 further characterized in that a
chassis is provided for removable insertion into said housing and
which is generally snugly received therein.

### 15 (Resubmitted)

The display sign of Claim 14 further characterized in that
said processor means is mounted on said chassis and said power
supply is also mounted on said chassis for operation of said
display panel.

### 16 (Resubmitted)

The display sign of Claim 12 further characterized in that a
display storage is associated with said processor means for storing
an electronic signal equivalent to a display to be generated.

13

17 (Resubmitted)

The display sign of Claim 12 further characterized in that said display sign also comprises receiver means for receiving a transmitted electronic signal equivalent to a display to be stored.

18 (Resubmitted)

The display sign of Claim 14 further characterized in that the means on the exterior of said housing comprises a mounting plate which is located on the exterior of said housing and is secured through said housing to said chassis in order preclude unauthorized removal from a mounted location.

19 (Resubmitted)

The display sign of Claim 12 further characterized in that an interference filter is on said sign and is capable of reflecting infrared radiation and a transmission of heat from said housing.

20 (Resubmitted)

The display system of Claim 1 further characterized in that said flat panel display member is a high definition multi-color and back lighted plasma operated screen.

9
22 (Once Amended)



The display system of Claim 1 further characterized in that said computer operated processor means comprises a memory means for storing and controlling the display of the electronic signals

14

received from the remote source for immediate <u>display</u> or later [displaying] <u>display and after receipt of same, said display is independent of the remote source</u>.

23 (Once Amended) *[14]*

The method for generating the display of Claim 8 *[10]* further characterized in that said method generates the display on a plasma operated <u>back lighted</u> screen.

24 (Once Amended)

The method for generating the display of Claim 6 further characterized in that said method comprises a sequencing capability for sequentially displaying each of the individual static displays for fixed periods of time which may be determined at said remote source, <u>and after receipt of same, the display thereof is independent of the remote source</u>.

25 (Once Amended)

The method of generating the display of Claim 6 further characterized in that said method comprises storing at the display sign and controlling the display of an image generated from a signal received from the remote source for immediate <u>display</u> or later display, <u>and after receipt of same, the display thereof is independent of the remote source</u>.

15

26 (Resubmitted)

The display sign of Claim 12 further characterized in that said power supply means comprises a first power supply for operating said processing means and a second power supply for operating other electrical components in said housing.

27 (Resubmitted)

The display sign of Claim 12 further characterized in that a lid extends over said interior compartment and closes same, said lid having an enlarged opening allowing for complete viewing of said display panel.

28 (Resubmitted)

The display sign of Claim 27 further characterized in that said ventilation means comprises a plurality of ventilation fans in said housing to cause movement of air through the interior compartment.

29 (Resubmitted)

The display sign of Claim 27 further characterized in that said flat display panel is located at said opening, and transparent protector sheet means covers said display panel allowing for viewing thereof.



### 30 (Allowed)

A display sign capable of generating a static display from a received electronic signal generated at and transmitted to said sign from a remote source, said display sign comprising:

a) an outer housing;

b) a display panel on said housing and being observable to a viewer;

c) processor means within said housing and receiving an electrical signal from a remote source representative of the display to be generated, said processor means causing generation of that static display in the display panel based on the signal received from the remote source; and

d) an interference filter on said sign and reflecting any infrared radiation and for enabling a transmission of heat from said housing.

### 31 (Allowed)

The display sign of Claim 30 further characterized in that said display panel is a plasma operated display panel.

### 32 (Allowed)

The display sign of Claim 30 further characterized in that a chassis is provided for removable insertion into said housing and which is generally snugly received therein and which carries said display panel and said processor means.

17

Sub
D 6

33 (Once Amended)

A display sign capable of generating a static display from a received electronic signal generated at and transmitted to said sign from a remote source, said display sign comprising:

a)   an outer housing;

b)   a computer <u>controlled and plasma</u> operated flat display panel on said housing and being observable to a [view] <u>large number of people in a group with wide angle viewing capacity</u>;

c)   window forming means on said housing allowing said display panel to be visible to a viewer;

d)   processor means within said housing and receiving an electrical signal from a remote source representative of the display to be generated, said processor means causing generation of that static display in the display panel based on the signal received from the remote source; and

e)   a transparent sheet extending over and being spaced apart from said display panel <u>to allow air flow past said panel to thereby enable</u> [for enabling] a dissipation of heat from said housing and to prevent transmission of force to said <u>relatively fragile</u> display panel which might otherwise crack said display panel.

18

## REMARKS

Responsive to the aforementioned office letter, and prior to discussing the claims in the application, as amended, it is believed that the issue of the inoperability of the Malec reference should be aired.   In particular, the Examiner has engaged in a treatment of attacking the applicant's assertion of invalidity of Malec by piecemeal arguments with respect to the various components of the system identified in the Malec patent.   It is respectfully urged that this type of action on the part of the Examiner is absolutely contrary to both Title 37, Code of Federal Regulations and the case law in general.   Title 37, C.F.R. §1.132 provides that an applicant effectively may challenge the application of a prior art reference by showing the invalidity thereof.   Admittedly, the Examiner can challenge the applicant's reasons as to why the reference may or may not be inoperative.   However, the action of the Examiner in this case at bar is to take issue with applicant's arguments directed to why various components would or would not function in the way defined by the applicant without dealing with the issue of inoperability.

The position of the Examiner with regard to inoperability almost suggests an utter indifference to the comments of the applicant.   It is respectfully urged that the applicant is no new comer to this field and has other U.S. patents in his name relating to similar subject matter.   The applicant is also the President and principal owner of a company engaged in the manufacture, sale and distribution of the systems taught and claimed the instant

19

application.  A great deal of research and development has been
devoted to these systems.  While the applicant does not wish to
deminimize the experience of the Examiner and the capabilities of
the Examiner, it is urged that the applicant is nevertheless one
5   who is quite experienced in and well known in this particular field
of display equipment.

As indicated previously, the applicant has examined the system
defined in the Malec patent and, moreover, has examined this system
in quite some detail.  The applicant is fully aware of how the
10  system in the Malec patent operates and the failure thereof.  In
fact, the company that embarked on producing the device in
accordance with the Malec patent was literally forced into
bankruptcy because of this failure.

Without identifying in detail all of the numerous problems
15  which arose with the system in the Malec patent, it suffices to
point out that, not only was battery power insufficient, there were
other problems as well.  As indicated previously, signal
transmission problems arose with interference from various
transmitters.  In order to properly broadcast signals to carts
20  which were passing by a particular location, a transmitter had to
be properly located.  In some cases, the transmitters were further
apart than in other cases.  This created numerous problems in
interference, particularly when the transmitters were too close to
one another.

25  Another one of the very serious problems was that with theft.
People would observe a display screen on a cart, conveniently



remove the cart from the premises, and equally conveniently remove the display screen.  Coupled with this problem was the fact that people would literally take the carts off of the premises not with any intent of theft, but to merely have a means of transporting

5  groceries or other purchased goods to their destination.  As the Examiner may appreciate, these carts are conveniently left at particular locations by the individual using same.  Again, not necessarily with intent of theft.  However, the availability of these carts far from the premise of the user enabled theft to

10  readily occur and also contributed to damage to the system in the event of inclimate weather.

Another one of the problems was that of visibility of the screen.  The liquid crystal diode screen of the type used in Malec did not provide effective resolution, was edge lit and therefore

15  not readily viewable, and almost necessarily had to be viewed at a angle perpendicular to the plane of the screen.  Side angle viewing was virtually impossible in the system of the Malec patent.

The above few problems, as well as those previously identified, clearly show the drawbacks in the Malec system and why

20  the same was inoperative.  Admittedly, on paper, it would present an ideal marketing tool to the product seller.  However, applicant can assure the U.S. Patent and Trademark Office that this system is not in the marketplace and it is highly doubtful that a system of the type taught in Malec would ever be used commercially.

25  The whole point of this discourse is that while the Examiner can pick and choose components and contend that they are or are not

effective or that they should or should not be effective is
irrelevant.  The applicant has clearly submitted a declaration to
the effect that the system is inoperative.  Whether the Examiner's
speculation has merit or not, it is urged that the U.S. Patent and

5    Trademark Office provide reasons why the system is not inoperative
rather than to speculate on what could be or could not be.  The
fact remains that the system has been removed from the marketplace,
the company producing same has gone into bankruptcy because of this
system, and notwithstanding the Examiner still wishes to challenge

10   the inoperability of this system.  Perhaps the U.S. Patent and
Trademark Office should tell the owners of the now defunct company
why their system was not inoperative.  One suspects that any such
assertions by the U.S. Patent and Trademark Office to those former
owners would fall on deaf ears and for the obvious reasons.

15       The whole point of this argument is that, by comparing the
battery in the Malec system with the battery in the instant
application, or the battery in Amo, et al, does not accomplish
anything with respect to the assertion of inoperativeness of the
system in the Malec patent.  As a result, the applicant believes

20   that any such arguments are obtuse and merely obviscate the real
issues regarding the fact that this reference should be removed as
a prior art reference.  Reconsideration is therefor respectfully
urged.

The Examiner also argues that, in response to the arguments

25   advanced by the applicant, that "there is no distinction between
the batteries of the present invention and the Malec system".  This

22



passage again shows that the Examiner has completely missed the point with regard to inoperability of Malec. There are no batteries in the present invention. The applicant has no need for batteries, since there is no cart to be moved around. The

5   applicant uses a stationary system. The applicant assumed that this was readily understood as one of the distinguishing aspects over Malec. The applicant even wonders if his arguments have been fully considered when the Examiner attempts to compare the battery of Malec with a hypothetical battery in the instant application,

10  when there are no batteries in the system of the instant application.

Again, it is urged that Malec is inoperative, the applicant has submitted a declaration to this effect after having intimate contact with the system of Malec, and the Examiner is placing

15  herself in a position of allegedly having knowledge of Malec superior to that of the applicant. Whether or not this system of the present invention had a battery is irrelevant when the issue is whether or not the system in Malec is operative. The Examiner is arguing some remote point which, in and of itself, does not provide

20  any reason as to why Malec would be operative.

As an interesting side note, one who is quite experienced in this field did look at the Malec patent and independently, without any prompting from the applicant or anyone else, made a statement to the effect that it would be a full time occupation charging

25  batteries in the carts used by Malec. If others in the field

recognize this problem, it is just not understood how the Examiner cannot recognize this problem.

The Examiner also states that the inoperability of Malec is only that considered by David Gothard, the applicant, and only his

5    point of view "and not necessarily agreed by skilled artisans". Again, the applicant would inquire as to what skilled artisans. Moreover, the applicant would inquire as to the reasons of these other skilled artisans.  For these reasons, it is believed that the Malec patent should be withdrawn as a prior art reference.

10    Turning now to the rejection on the basis of the cited prior art, it is further believed that a brief description of how the invention differs from these references would be appropriate.  It is not necessary for the applicant to challenge every item which the Examiner argues is met by the prior art references.  The fact

15    remains that it is not necessarily critical that each or certain of the references use a computer operated system or a microprocessor. It is not critical that each use some type of display screen.  The fact remains that the real distinction of the display sign of the invention has been utterly overlooked in the rush to detail by the

20    U.S. Patent and Trademark Office.  In other words, it appears as though the U.S. Patent and Trademark Office is focusing on details and completely overlooking the broad picture of the present invention.

One of the important distinctions over the systems of the

25    prior art which applicant has continuously stressed and to which only lip service has been given by the U.S. Patent and Trademark

Office is the fact that the display sign of the present invention, although being readily transportable, is designed for use at a fixed location.  It is urged that with regard to Amo, et al and Dumond, Jr., et al, that the systems are not readily transportable.

5    In Amo, et al the display system is used in an elevator.  In Dumond Jr., et al the display system is used on a bus.  Admittedly, the bus is movable, although the display system is not movable apart from that bus.  The Examiner seems to suggest that by removing screws, bolts, etc. that the display system is movable.  To take

10   that same argument to its logical conclusion, by removing the steel girders from the concrete foundation, the World Trade Center is also movable.  This argument is so utterly unrelated to the issues at hand that further discussion need not be required.  The fact remains that in Dumond Jr, et al and Amo, et al, the display

15   systems are not movable apart from the structures in which they are mounted.

The Examiner also takes the position that the display system in Malec is movable.  There is no doubt that the display screen in Malec is movable, a fact which the applicant has readily admitted

20   throughout.  What remains unanswered by the Examiner's position is that the display screen in Malec is about as useless as a fork without food.  In short, the display system on the cart in Malec cannot operate, not only without the transmitter located on the shelf, but that transmitter cannot operate without a slave unit

25   located elsewhere in the facility.  In other words, information is delivered to a central computer or other central source and which

must be delivered, in turn, to each of the individual transmitters. The display screen can only operate when accessed by one of those transmitters. Standing my itself, the display screen is useless. Also, standing by itself, the transmitter is useless. In other words, all three pieces are located in different places and all are necessary for any type of display whatsoever in the system shown in the Malec patent.

Malec is just not a stand alone and self-contained unit as is the system of the present invention. The applicant has continuously stressed, and here again also stresses, that the system of the present invention is self-contained in that it can literally be downloaded, and remain on site and display messages or other information literally for years, if need be, without accessing from a remote source. In Malec, there is no stand alone system which can be operated on this same basis. Consequently, the Examiner's argument is utterly without foundation regarding Malec and must fail.

It is also pointed out that Malec operates on a "run-time application". That is, Malec operates only when a central control system informs the processor in a particular facility, which, in turn, informs the transmitter, and which in turn informs the display screen to operate. It is obvious in Malec that there must be a networking. The transmitters must be connected to the central station in a store facility and, generally, the central processor is operated from the remote source. Even if the central processor was not operated from the remote source, as indicated previously,

26

there are three individual components in Malec and which must operate in unison. Consequently, each must be networked to one another. In the applicant's system, other than for a source of power, there is no electronic network in the present invention,

5      save for an electrical cable for power.

It is again urged that Malec, even if it were operative, which is not the case, discloses an entirely different system and one which is limited to electronic networking in a particular facility. The system of the present invention can be taken from one facility

10     to another at quite some distance and be completely operable on its own. In order to move the shopping cart in Malec, it would be necessary to move the central processor from one location and to remove all of the transmitters from other locations and reinstall them in a new facility. All of these little factors seem to be

15     overlooked by the Examiner in the rush to detail about how Malec and the present invention each have similar components.

It is also interesting to note that the system in Amo, et al again requires a networking which is not found in the present invention. Each of the elevators in Amo, et al must be connected

20     to a central source. It is also interesting to note that Amo, et al talks about an ethernet cable and how the ethernet cable is run down through the elevator shaft to the elevator. First of all, elevators are operated with a fairly high voltage, usually in the range of about 440 volts. Ethernet cables should not even be

25     operated in close proximity to 110 volt wires. Consequently, when operating an ethernet cable in proximity to 440 volts, one must

27

really wonder what happens to the message that is transmitted over the ethernet cable.

It is also interesting to note that an ethernet cable is limited in size to about 100 yards. It is fairly well established that ethernet cables which exceed 100 yards in length are not capable of accurately transmitting information. Admittedly, 100 yards is equivalent to the length of a football field. However, the system in Amo, et al must be limited in size. It must be remembered that this ethernet cable must be trained from a central computer source in the facility in which the elevators are operating. That computer source may frequently be located with other banks of computers in a store facility. Consequently, it may run for quite some distance before even reaching the elevator shafts. In addition, for a large building, 100 yards may not be sufficient even if the computer source were located at the upper end of an elevator shaft. Consequently, and although the ethernet system in Amo, et al could work, other than with the high voltage problem, it would necessarily be used only in buildings of limited size. Moreover, the computer source would have to be located near the elevator shafts, a possibility which is highly unlikely. The problem is also raised as to what happens if there are more than one bank of elevator shafts.

Notwithstanding the foregoing, it is also noted that Amo, et al requires two major components, namely, the display screen and the elevators and the computer source or other central processing

28

source.  Again, they are not readily transportable and, moreover, they do not constitute a stand alone and self-contained unit.

In Dumond Jr., et al there is no internal mass storage unit. The sign must frequently update from the central source in the

5   facility.  It does not operate on a pre-loading basis at all.  The main memory is a cycling memory in Dummond Jr., et al. Consequently, Dummond Jr., et al is completely dependent upon an electronic network.

Applicant has more fully amended Claim 1 to recite the display

10  generating means at the remote source and the means for transmitting the signals from that remote source.  In addition, Claim 1 calls for the display sign per se.  It is to be noted that Claim 1 has been revamped to call for the three principle components of that display sign.  First of all, Claim 1 calls for

15  the electronically operable flat panel display, the self-contained computer operated processing means in the display sign, and the memory means forming part of the processing means.  It is urged that the prior art does not include this particular limitations. As indicated previously, there is no self-contained and stand alone

20  display sign in any of these prior art references.  In addition, Claim 1 has been amended to recite that the display sign is not only self-contained, but it is independently operable of any network for generation of the displays.  Again, this is obviously not the case in Malec, since it must have the central source and

25  the various transmitters.  The elevators in Amo, et al also require a central source at a remote location.  The same holds true with

29



the buses in Dumond Jr., et al.  Consequently, it is urged that the prior art relied upon by the Examiner cannot respond to these limitations.

5    Claim 1 has further amended to recite that a large number of different displays can be stored in the memory means of the display sign on a time selected basis and independently of the electronic signals from the display generating means at the remote source.  In other words, the display sign can literally be separated from and never again contact the remote source to be operated and still

10   present numerous displays.  Admittedly, it is desirable to update information with new products offered, new prices, etc.  However, the fact remains that the system of the present invention is a true stand alone system and that cannot be said of any of the systems in the prior art.

15   Applicant has also amended Claim 1 to call for the flat panel display with wide angle viewing almost independently of the angle of view by an individual.  Although Claim 1 does not call for the plasma operated display, it is urged that the prior art does not provide a wide angle view for the reasons which are hereinafter

20   presented in more detail.  For each of the foregoing reasons, it is believed that Claim 1 and the claims dependent thereon, namely, Claims 2-5 are allowable and allowance therefor is respectfully solicited.

Claim 6 has also been amended to call for the fact that the

25   display sign is operable without the need for electronic signal networking, such that the display operates as a self-contained and

stand alone unit.  Again, for the reasons presented regarding allowance of Claim 1, it is urged that the prior art does not respond to Claim 6.  In addition, Claim 6 calls for the fact that the time of display is automatically controlled at the display

5   sign.  In other words, there is no need for operation at a remote source to control the display times.  Again, with regard to the prior art, it is admitted that the display timing can be controlled from the computer system in that facility.  However, the display sign itself must be controlled from something else.  Such is not

10   the case in the present invention.  It is therefore believed that Claim 6 and Claims 7-9 dependent thereon are allowable.

Another unique aspect of the present invention which has not been disclosed in the prior art and which again appears to be summarily dismissed by the Examiner, is the fact that applicant is

15   operating with a plasma operated display panel.  It is urged that none of the prior art references use this type of display system. The Examiner attempts lightly walk over and disregard this limitation by contending that the plasma operating display is merely a matter of choice.  However, it is to be noted that there

20   are significant differences between the plasma operated display in the present invention and any of the display systems in the prior art.  Again, it is believed that some discussion is necessary to highlight these major distinctions.

First of all, and with regard to the display medium, Malec is

25   using a liquid crystal display common to essentially all computer display screens.  The LCD display, as the Examiner presumably

31

knows, is a cold cathode display system of the type used in essentially all conventional cathode ray tubes. Moreover, liquid crystal displays are limited, both in viewing angle and in resolution. Generally, most liquid crystal displays have very

5  limited resolution. If the Examiner does not believe this point, it is urged that she examine a computer display screen for resolution and compare that to a plasma operated screen. The difference are dramatic. Details readily unobservable in a liquid crystal display are immediately observable with a flat panel

10  display screen. Moreover, the liquid crystal display is limited by color content. Color can only be controlled through the color guns and only to a limited degree. In other words, there is not an independent color control at each pixel which there is in a flat panel display screen. In a liquid crystal display screen of the

15  type used in Malec, one can control the entire screen but not the individual pixels on that screen. This is complete contrast to the flat panel display screen of the type used in the present invention.

       The next type of display which is shown in the prior art is

20  that of the light emitting diode. Again, the light emitting diode has essentially the same limitations as the liquid crystal display screen. In effect, the light emitting diode screen is effectively nothing more than individual lights which are controlled through a matrix. This is exactly the type of system which is used in Dumond

25  Jr., et al. Again, light emitting diode screens represent an early phase of prior art with regard to display screens, are not very

efficient, have low resolution, and certainly do not have wide angle viewing capability. If the Examiner has any doubt about this fact, it is urged that she examine a lap top computer or, for that matter, a desk computer and also examine any device using a light

5   emitting diode display, as in many display signs. It would be readily observed that wide angle viewing is not possible.

It has been fairly well established, for example, that liquid crystal display screens have a viewing angle of approximately 90° from a point source. Light emitting diode screens have a viewing

10   capability of even less than 90°. In contrast, flat panel display screens of the type used in the present invention have a viewing angle of about 160° from any point source on that screen. Consequently, it is urged that there is a much greater viewing angle. It can be understood that if the angle of view were 180°,

15   one could literally stand to the side of the screen and view the screen. Obviously, that is impossible but, nevertheless, it does illustrate the fact that a 160° angle view is a very wide angle view and something that is not even remotely approachable with any of the systems in the prior art.

20   As also indicated previously, resolution is significantly less with any of these prior art systems than with the present invention. In effect, the prior art deals with liquid crystal displays, edge lit crystal diode displays, and a conventional CRT display. Obviously, the conventional CRT display has been around

25   since the late 1930's and display capabilities have not been improved substantially since that time. Consequently, each of the

33

prior art systems have serious limitations on both resolution and viewing angle capability when compared to the plasma operated screens of the type used in the present invention.

5    The plasma operated screens of the invention are not only wide angle and high resolution, but they are back lighted. Consequently, they are evenly lit across the entire surface area of the screen. Such is not the case with system of the type in Amo, et al, for example. Consequently, it cannot be said that the prior art screens are equivalent to the plasma operated screens. The

10   Examiner again dismisses this fact on the grounds that a display is conventional and it is "up to the designer's discretion what kind of display to use depending on its feasibility, cost and availability". Again, this completely overlooks the limitations used in the present application. If it were so obvious, as the

15   Examiner contends, then one inquire as to why there is not even one prior art reference cited which shows the use of plasma operated display screen in this type of display sign, whether on a bus, in an elevator, or on a shopping cart. The fact remains that there is none. Consequently, that which the Examiner contends is obvious is

20   again utterly without foundation.

It is also noted that the use of this display is one of the elements at the point of novelty in the present invention. Consequently, at the point of novelty, the Examiner cannot merely contend that something is obvious without citing a prior art

25   reference. If the use of a plasma operated screen in a display sign of this type, again, whether on a bus, elevator or shopping

34

cart, were so obvious, the Examiner is urged to cite a prior art reference. Otherwise, the Examiner must withdraw the rejection under 35 U.S.C., since that which may be obvious to the Examiner is obviously not obvious when there is no prior art reference to
5    support same.

Claim 10 has been amended to call for the plasma operated flat panel display screen and one which is back lit. The claim also calls for the high density resolution and the wide angle viewing, which is clearly not available in the prior art. In addition, the
10   claim calls for the fact that there is no need for electronic networking in order to generate the display. For each of these reasons, it is believed that Claims 10 and 11 are allowable and allowance therefor is respectfully solicited. Each of the dependent claims which call for the plasma operated screen, such as
15   Claims 20 and 23, are also believed to be allowable and allowance therefor is respectfully solicited.

It is interesting to note that the Examiner again relies upon the Iannini Patent No. 5,089,745 to allegedly show the use of a flat panel display screen. The applicant has previously pointed
20   out that Iannini does not disclose a flat panel display screen. Consequently, the Examiner's continued reliance on Iannini is just absolutely not understood. In fact, a simple reading of Iannini will reveal that it uses a gas discharge tube. This is not a flat panel plasma operated display. The two are so utterly different
25   that one cannot even be equated to another. Notwithstanding, even

if Iannini disclosed a flat panel display, which it obviously does
not, it has nothing to do with display devices of the invention.

Iannini is used in amusement devices of the type found in
amusement parks in the 1950's and 1960's.   Iannini is clearly
5    dealing with a type of display which was an antique at the time
these plasma operated flat panels were first introduced.   Thus, for
the Examiner to rely upon Iannini is total error in connection with
the instant application.

The applicant has amended Claims 12-19 to again call for the
10    plasma operated display and which, again, for the reasons
previously enumerated, is not shown in the prior art.   The
recitation of the housing in Claim 12 is also important, in that it
does, in fact, distinguish over the prior art.   The Examiner seems
to dismiss many of the limitations in Claims 12-19 as being
15    obvious.   However, as indicated previously, flat panel display
screens are quite fragile and can readily crack under undue stress.
It is for this reason that the housing has been designed with a
special chassis, as pointed out in the specification.   The Examiner
take the position that one would use a chassis if desired.
20    Moreover, the Examiner contends that the housing in Malec is a
chassis.   If such be the case, there is still a missing element in
Malec, in that there is not a separate component which would
constitute the chassis.   Notwithstanding, the use of a chassis is
not obvious.   It is only because the applicant is attempting to
25    isolate the flat panel display screen.   Without the flat panel
display screen, this unique housing would not have been required.

36

It is also to be noted that clause (d) calls for the means to mount the housing on the exterior without placing undue stress on the display screen.  The Examiner takes the position that this is provided in Malec.  Again, the Examiner is in error.  Malec does

5    not have a housing, except for the central control and which can be placed on a desk or other support.  The central controller does not have a display screen.  The display screens are mounted on carts and, since they are liquid crystal displays, they are not subject to the same sensitivity as the flat panel display screen.

10   Consequently, it is urged that Claims 12-19 do patentably distinguish over the prior art and allowance therefor is respectfully solicited.

Allowance of Claims 30-32 is noted with appreciation. However, and while these Claims 30-32 have been allowed, it is also

15   noted that they are limited to a very specific aspect of the invention and almost entirely side step the real inventive contributions set forth by the applicant.

It is also noted that the Examiner has rejected Claims 33 and 34 as being unpatentable on the basis of the Malec patent.  The

20   Examiner notes that Malec fails to disclose a transparent protector, but that it would be obvious to use a protective sheet in order to protect the display in Malec.  It strongly appears as though Malec is using nothing more than a small portable computer screen mounted directly on a shopping cart.  Before making any such

25   objection, one would expect the Examiner to stop and inquire as to why there is no protective sheet over the computer screen in a

37

standard portable computer. It is obvious that no such inquiry was ever even considered. The Examiner merely makes a blanket statement without any foundation whatsoever that one would use a protective screen in Malec. If one would use a protective screen

5    in Malec, then one must also inquire as to why the portable computers in the marketplace do not use a protective screen. It is urged that this rejection on the part of the Examiner is so utterly without foundation that it should be withdrawn. One could presumably conceive of a better reason than the fact that Malec

10   would need a protective surface.

The fact remains that the Examiner has utterly overlooked limitations in the claims dealing with the fact that the protective screen is to permit an air gap allowing for heat dissipation. The Examiner conveniently overlooks this fact. Malec does not have a

15   heat dissipation problem or at least one which would require a gap for air flow past the screen. Indeed, and even in a small portable computer or in the device shown on the cart in Malec, not only would there be no need for an air flow gap, but there would be no provision in the small compact space of a portable computer.

20   The applicant has amended Claims 33 and 34 to call for the fact that the screen is a plasma operated screen. This is the type of screen which does generate a substantial amount of heat. The same problem does not necessarily obtain with Malec. In fact, any heat generation is easily handled in accordance with the standard

25   portable computer. Nevertheless, Claim 34 now recites that the transparent sheet allows for air flow past the panel and enables

dissipation of heat and also prevents transmission of force to a relatively fragile panel.  Such does not exist in the display panel in Malec.  The display panels in Malec and, for that matter, in most computers and, for that matter, most CRT's, just simply are

5    not fragile.  Consequently, they do not require this type of protective screen.  Moreover, they do not require a protective shield which is spaced from the screen in order to provide for air flow.  Consequently, it is believed that the Examiner has completely overlooked the whole basis of Claims 33 and 34.

10    Nevertheless, the applicant has cancelled Claim 34, but allowance of Claim 33 is respectfully solicited for the reasons presented above.

       In view of the foregoing, favorable reconsideration and allowance is respectfully solicited.

15

    Dated: _August 17_, 2000

                       Respectfully submitted,

20

                       ROBERT J. SCHAAP
                       Attorney for Applicant
                       Registration No. 20,577
25                   (818) 346-6555

ADMEDIA\AMEND-B.284

39

