# EXHIBIT B

JUL 23 1999    N THE UNITED STATES PATENT AND TRADEMARK OFFICE

IN RE APPLICATION OF:    )

DAVID GOTHARD    )

SERIAL NO. 09/132,456    )

FILED: AUGUST 11, 1998    )    GROUP ART UNIT NO. 2736

TITLE: REMOTE CONTROL ELECTRONIC    )
       DISPLAY SYSTEM    )

EXAMINER: JULIE LIEU    )

## AMENDMENT B

Commissioner of Patents
   and Trademarks
Washington, D.C. 20231

Sir:

     Responsive to the official communication dated March 31, 1999,

please amend the above-entitled application as follows:

### IN THE SPECIFICATION

     Page 2, line 7, delete "us" and insert therefor --- me ---;

     Page 5, line 25, delete "I" and insert therefor --- In ---;

### IN THE CLAIMS

     Please amend Claims 1-3, 5, 6, 9, 10, 12, 15 and 19.

     Claims 4, 7, 8, 11, 13, 14 and 16-18 are being resubmitted and

re-presented herein for the convenience of the U.S. Patent and

Trademark Office.

     Please add the following new Claims 20-33.

DA000083



1 (Once Amended)

A display system for generating at a remote source a static display for presentation on a display sign <u>at a generally fixed location</u> and which is electronically transmitted from the remote source to the display sign, said display system comprising:

    a)    display generating means at the remote source for generating a [display] <u>plurality of displays</u> in the form of [an] electrical [signal] <u>signals</u> capable of being transmitted;

    b)    a display sign <u>which may be located at a substantial distance from the display generating means and</u> having an electronically operable <u>flat panel</u> display [panel] <u>member</u>;

    c)    <u>computer operated</u> processing means in said display sign for generating a static display from the [signal] <u>signals</u> generated at and transmitted from the remote source; <u>and</u>

    d)    means for transmitting [an] electronic [signal] <u>signals</u> representative of [that display] <u>the plurality of displays</u> from the remote source to the processing means at the display sign <u>so that the signals may be reconverted to visible images which are statically displayed one at a time at the display sign.</u>

2

DA000084

### 2 (Once Amended)

The display system of Claim 1 further characterized in that the electronic [signal is] <u>signals are</u> transmitted from the remote source to the processing means through an electrical conductor.

### 3 (Once Amended)

The display system of Claim 1 further characterized in that the electronic [signal is] <u>signals are</u> transmitted from the remote source to the processing means through a wireless transmission means.

### 4 (Resubmitted)

The display system of Claim 1 further characterized in that said system comprises means for sequencing a plurality of sequential displays which are generated at said remote source and transmitted to said display sign and which are re-generated and displayed at the display sign.

### 5 (Once Amended)

The display system of Claim 4 further characterized in that said system comprises storage means at the remote site for holding a [display] <u>plurality of displays</u> in the form of [an] electronic [signal] <u>signals</u> for ultimate transmission to said display sign.

3

DA000085

#### 2 (Once Amended)

The display system of Claim 1 further characterized in that the electronic [signal is] signals are transmitted from the remote source to the processing means through an electrical conductor.

#### 3 (Once Amended)

The display system of Claim 1 further characterized in that the electronic [signal is] signals are transmitted from the remote source to the processing means through a wireless transmission means.

#### 4 (Resubmitted)

The display system of Claim 1 further characterized in that said system comprises means for sequencing a plurality of sequential displays which are generated at said remote source and transmitted to said display sign and which are re-generated and displayed at the display sign.

#### 5 (Once Amended)

The display system of Claim 4 further characterized in that said system comprises storage means at the remote site for holding a [display] plurality of displays in the form of [an] electronic [signal] signals for ultimate transmission to said display sign.

4

6 (Once Amended)



A method for generating a <u>plurality of individual</u> static [display] <u>displays</u> at a remote source and electronically transmitting the [display at] <u>displays to</u> a display sign <u>located at a substantial distance from the remote source</u> for presentation, said method comprising:

    a)    electronically generating a [display] <u>plurality of displays</u> at a remote source <u>with each</u> in the form of [an electronic signal] <u>a visual image</u>;

    <u>b)</u>    <u>converting the visual image to an electronic signal at the remote site;</u>

    <u>c)</u>    <u>temporarily storing the electronic signal in a temporary storage at the remote site for potential further processing;</u>

[(b)] <u>d)</u>    <u>permanently</u> storing the electronic signal <u>at a permanent storage</u> at the remote source for ultimate transmission to the display sign;

[(c)] <u>e)</u>    transmitting the signal to <u>a processing means at</u> the display sign;[ and]

    <u>f)</u>    <u>storing the display at a processing means forming part of the display sign;</u>

[(d)] <u>g)</u>    re-generating the display from the electronic signal and statically displaying same on the display sign[.] <u>; and</u>

5

DA000087

h) controlling the time of display and the particular
display which is regenerated at either the display
sign or the remote source.

### 7 (Resubmitted)

The method for generating the display of Claim 6 further
characterized in that the method comprises transmitting the
electronic signal from the remote source to the display sign
through an electrical conductor.

### 8 (Resubmitted)

The method for generating the display of Claim 6 further
characterized in that the method comprises transmitting the
electronic signal from the remote source to the display sign
through wireless transmission means.

### 9 (Once Amended)

The method for generating the display of Claim 6 further
characterized in that the method comprises [generating a plurality
of images in electronic format and] sequentially transmitting said
plurality of displays [same] to said display sign [for sequential
display] and sequentially displaying said individual displays.

6

DA000088



### 10 (Once Amended)

A display generating system for generating a display in electronic format at a source remote to and transmitting same to a display sign for display on said display sign, said system comprising:

a)  scanner means for scanning a previously prepared image and providing a temporary image signal;

b)  a temporary storage means for receiving and temporarily holding said temporary image signal;

c)  keyboard means for introducing and receiving in said temporary storage means keyboard input signals to modify or add to the temporary image signal;

d)  processing means for receiving said temporary image signal [means] and keyboard input signals and processing and editing same in a predetermined format to provide an electronic signal representative of a display; and

e)  permanent storage means receiving and holding said electronic signal so that said electronic signal which is fully processed can be later transmitted to a site of use.

### 11 (Resubmitted)

The display generating system of Claim 10 further characterized in that said system comprises editing means operating in conjunction with said processing means.

7

DA000089



### 12 (Once Amended)

A display sign capable of generating a static display from a received electronic signal generated at and transmitted to said sign from a remote source, said display sign comprising:

a)  an outer housing <u>having an interior compartment</u>;

b)  a <u>relatively thin flat</u> display panel on said housing and being observable to a viewer;

c)  processor means within <u>the interior compartment of</u> said housing and receiving an electrical signal from a remote source representative of the display to be generated, said processor means causing generation of that static display in the display panel based on the signal received from the remote source[.] <u>;</u>

d)  <u>a power supply means located in the interior compartment of said housing for operating said processing means and operating other electrically operable components in said housing; and</u>

e)  <u>ventilation means for causing an air flow through the housing and dissipation of heat generation in said housing.</u>

### 13 (Resubmitted)

The display sign of Claim 12 further characterized in that said display panel is a plasma operated display panel.

8

DA000090

### 14 (Resubmitted)

The display sign of Claim 12 further characterized in that a chassis is provided for removable insertion into said housing and which is generally snugly received therein.

### 15 (Once Amended)

The display sign of Claim 14 further characterized in that said processor means is mounted on said chassis and [a] said power supply is also mounted on said chassis for operation of said display panel.

### 16 (Resubmitted)

The display sign of Claim 12 further characterized in that a display storage is associated with said processor means for storing an electronic signal equivalent to a display to be generated.

### 17 (Resubmitted)

The display sign of Claim 12 further characterized in that said display sign also comprises receiver means for receiving a transmitted electronic signal equivalent to a display to be stored.

### 18 (Resubmitted)

The display sign of Claim 14 further characterized in that a mounting plate is located on the exterior of said housing and is secured through said housing to said chassis in order preclude unauthorized removal from a mounted location.

9

DA000091



### 19 (Once Amended)

The display sign of Claim 12 further characterized in that an interference filter is on said sign and is capable of reflecting infrared radiation [for enabling] <u>and</u> a transmission of heat from said housing.



### 20 (New Claim)

The display system of Claim 1 further characterized in that said flat panel display member is a plasma operated screen.

### 21 (New Claim)

The display system of Claim 1 further characterized in that said processing means in said display sign has a sequencing capability so as to sequentially display each of the individual static displays for fixed periods of time which may be determined at said remote source.

### 22 (New Claim)

The display system of Claim 1 further characterized in that said computer operated processing means comprises a memory means for storing and controlling the display of the signal received from the remote source for immediate or later displaying.

10

DA000092

### 23 (New Claim)

The display system of Claim 20 further characterized in that said display member is a multi-color back lighted plasma operated screen.

### 24 (New Claim)

The method for generating the display of Claim 6 further characterized in that said method generates the display on a plasma operated screen.

### 25 (New Claim)

The method for generating the display of Claim 6 further characterized in that said method comprises sequencing capability for sequentially displaying each of the individual static displays for fixed periods of time which may be determined at said remote source.

### 26 (New Claim)

The method of generating the display of Claim 6 further characterized in that said method comprises storing at the display sign and controlling the display of a signal received from the remote source for immediate or later display.

### 27 (New Claim)

The display sign of Claim 12 further characterized in that said power supply means comprises a first power supply for

11

DA000093

operating said processing means and a second power supply for operating other electrical components in said housing.

### 28 (New Claim)

The display sign of Claim 12 further characterized in that a lid extends over said interior compartment and closes same, said lid having an enlarged opening allowing for complete viewing of said display panel.

### 29 (New Claim)

The display sign of Claim 28 further characterized in that said ventilation means comprises a plurality of ventilation fans in said housing to cause movement of air through the interior compartment.

### 30 (New Claim)

The display sign of Claim 28 further characterized in that said flat display panel is located at said opening, and transparent protector sheet means covers said display panel allowing for viewing thereof.

DA000094



### 31 (New Claim)

A display sign capable of generating a static display from a received electronic signal generated at and transmitted to said sign from a remote source, said display sign comprising:

a)   an outer housing;

b)   a display panel on said housing and being observable to a viewer;

c)   processor means within said housing and receiving an electrical signal from a remote source representative of the display to be generated, said processor means causing generation of that static display in the display panel based on the signal received from the remote source; and

d)   an interference filter on said sign and reflecting any infrared radiation and for enabling a transmission of heat from said housing.

### 32 (New Claim)

The display sign of Claim 31 further characterized in that said display panel is a plasma operated display panel.

### 33 (New Claim)

The display sign of Claim 31 further characterized in that a chassis is provided for removable insertion into said housing and which is generally snugly received therein and which carries said display panel and said processor means.

13

DA000095

numerous problems not capable of being solved. One of the main problems was that of charging the batteries in each of the individual carts. There was effectively no means for a store owner or store operator to keep track of individual cart and monitor the

5    charge of each of the individual batteries. That alone created a tremendous bookkeeping problem.

Notwithstanding the actual bookkeeping problems, it is also recognized that the batteries used in these types of carts, namely, deep cycle batteries, must maintain a minimum level of charge

10   before they become permanently damaged. Thus, if the charge of a battery drops more than eighty percent of its normal full charge, and the battery is still used, the damage to the battery becomes permanent and the battery effectively destroyed for its intended purpose.

15   Another one of the problems encountered with the system described in the Malec, et al '064 patent is the fact that with the terminals and the batteries, the weight of the cart was substantially increased. This caused the consumer to push a heavier cart than the consumer was normally accustomed to pushing.

20   In addition, it was also found that dry cell batteries were not sufficient to operate the display system for any reasonable period of time and it was almost inherently necessary to use wet cell batteries. However, many customers had strong concerns about pushing a cart with wet cell batteries, particularly with children

25   in proximity. Notwithstanding, the attendant injury from the use of wet cell batteries also substantially increased and this, in

14

numerous problems not capable of being solved.  One of the main problems was that of charging the batteries in each of the individual carts.  There was effectively no means for a store owner or store operator to keep track of individual cart and monitor the

5    charge of each of the individual batteries.  That alone created a tremendous bookkeeping problem.

Notwithstanding the actual bookkeeping problems, it is also recognized that the batteries used in these types of carts, namely, deep cycle batteries, must maintain a minimum level of charge

10    before they become permanently damaged.  Thus, if the charge of a battery drops more than eighty percent of its normal full charge, and the battery is still used, the damage to the battery becomes permanent and the battery effectively destroyed for its intended purpose.

15    Another one of the problems encountered with the system described in the Malec, et al '064 patent is the fact that with the terminals and the batteries, the weight of the cart was substantially increased.  This caused the consumer to push a heavier cart than the consumer was normally accustomed to pushing.

20    In addition, it was also found that dry cell batteries were not sufficient to operate the display system for any reasonable period of time and it was almost inherently necessary to use wet cell batteries.  However, many customers had strong concerns about pushing a cart with wet cell batteries, particularly with children

25    in proximity.  Notwithstanding, the attendant injury from the use of wet cell batteries also substantially increased and this, in

15

DA000097

effective, raises the insurance rates on the use of these types of carts.

Another one of the problems which was actually encountered with the system of Malec, et al '064 is that of theft. Due to the
5  fact that there was a display and some electronics operating that display, many consumers thought that the cart included a self-contained computer. Even though this was not the case, theft nevertheless became a significant problem. Notwithstanding, and perhaps because of the theory that some people will steal anything
10  regardless of whether or not it has value, theft was nevertheless a significant problem.

As a result of the foregoing problems, and although Malec, et al '064 was an excellent idea in principle, it was not effectively usable.

15  In addition to the foregoing, there were numerous other electrical problems which can result from the use of the Malec, et al system, not to mention the very substantial cost of equipping each cart with a display. As the Examiner may also appreciate, some people will actually use the cart not for purposes of theft,
20  but merely to carry their groceries or other purchases to their destination. As a result, the cart remains left in an alleyway or elsewhere and, after the first downpour of rain, the system is no longer operable.

Aside from the practical problems in Malec, et al, the actual
25  operating problems included transmission only for a specific site. If transmission was sufficiently extensive so that a cart could be

16

DA000098

used, e.g., ten feet aware from the site to a present an effective
visible image, then interference from other sites is encountered.
Thus, transmission sites had to be sufficiently far apart, thereby
reducing the number of possible transmission sites. Even here,

5    interference cannot be completely avoided. Associated with this
problem is that of background noise. If an audible system is to be
used, it must be loud enough for the consumer to hear but, in like
manner, a large number of these carts being pushed through a
particular facility can substantially raise the background noise

10   level.

It is also important to note that in Malec, et al, there is no
use of a flat panel display screen. Malec, et al is actually using
a liquid crystal display screen. The use of a liquid crystal
screen presents numerous problems as, for example, the fact that

15   the light source is not evenly distributed across a screen of any
size. Moreover, brightness in any LCD screen is really minimal.
The applicant, on the other hand, uses a plasma technology.
Moreover, the screen in the instant application is actually back
lighted.

20   The use of the system of the present invention and,
particularly, with a flat panel display screen, is quite
advantageous in that brightness is available and much stronger
color presentation is achieved. Moreover, the largest LCD screen
which could be used is eighteen inches and that is probably

25   excessive for any significant transmission. Contrariwise, there is
essentially no limit on the size of the flat panel screen used in

17

DA000099

could be located hundreds, if not thousands, of miles away from the remote source.

The information can be transmitted to the display sign and periodically changed at will. All that is required is for the
5     store owner or operator to inform the display sign company of those changes which are to be made as, for example, a special which may be made available, a change in price, a change in a featured item, etc. The new display is generated, automatically transmitted to the display sign and, at an appropriate time, it is displayed. For
10    that matter, a plurality of individual displays can be prepared and presented from the remote source.

Turning now to the other references cited by the Examiner, they all appear to use display systems of one type of another, but all with respect to a special market area. In Amo, et al, the
15    display apparatus is to be used with elevator cabs or elevator waiting areas. In effect, Amo, et al is literally using a TV type presentation, although they are using liquid crystal display screens. In effect, Amo, et al uses pre-programmed television channels intermittently with messages which may be presented. The
20    system in Amo, et al is pre-programmed so that the television display will turn off when a message is to be presented and vice versa.

With regard to the Dumond, et al patent, the patentees are again using lighting emitting diodes signs. Please see, for
25    example, column 6 of the Dumond, et al patent. Please note in particular column 6, lines 16-30. Again, and as indicated, Dumond,

DA000100

could be located hundreds, if not thousands, of miles away from the remote source.

The information can be transmitted to the display sign and periodically changed at will. All that is required is for the
5    store owner or operator to inform the display sign company of those changes which are to be made as, for example, a special which may be made available, a change in price, a change in a featured item, etc. The new display is generated, automatically transmitted to the display sign and, at an appropriate time, it is displayed. For
10    that matter, a plurality of individual displays can be prepared and presented from the remote source.

Turning now to the other references cited by the Examiner, they all appear to use display systems of one type of another, but all with respect to a special market area. In Amo, et al, the
15    display apparatus is to be used with elevator cabs or elevator waiting areas. In effect, Amo, et al is literally using a TV type presentation, although they are using liquid crystal display screens. In effect, Amo, et al uses pre-programmed television channels intermittently with messages which may be presented. The
20    system in Amo, et al is pre-programmed so that the television display will turn off when a message is to be presented and vice versa.

With regard to the Dumond, et al patent, the patentees are again using lighting emitting diodes signs. Please see, for
25    example, column 6 of the Dumond, et al patent. Please note in particular column 6, lines 16-30. Again, and as indicated, Dumond,

19

DA000101

et al are concerned with public transit, such as buses, and use the buses to present messages or other information. Again, the use of the LDC signs in Dumond, et al materially limits the availability of use and the effectiveness of that system. Arguably, one can

5      present a picture, but the definition and clarity will be quite limited.

The Innanini patent actually relates a totally different device and really has little relevance to flat panel displays and even more so has little relevance to plasma displays. The best

10    that can be said of Innanini is that it uses a gas discharge. the applicant is actually aware of the system taught in the Innanini patent and which is used by Bertone, Inc. of Canada. Innanini is actually only concerned with an amusement device. Innanini does not propose the use of a screen, as such. Rather, Innanini has a

15    neon (cold cathode tube) and is only is controlling ionization in that tube.

Innanini talks about the fact that the tube can be bent into the form a sign. There are no pixels to generate an image, as in the case of the present invention or, for that matter, in the other

20    prior art references. All that Innanini has relevance for in this present situation is that he is ionizing an inner gas. In effect, Innanini is controlling the ionization function of that gas. Innanini cannot change color and really cannot change the output of that tube. Admittedly, a plasma is a gas but the tube of Innanini

25    is not a flat panel screen.

20

DA000102

Turning now to the claims, the applicant has amended Claims 1-6 to more fully define the display system from the standpoint that a display is generated at a remote source and transmitted from that remote source to a display sign located elsewhere. Each of Claims

5    1-6 call for the fact that a display sign is used at a generally fixed location and this, by definition, distinguishes over Malec, et al, Amo, et al and Dumond, et al. As indicated previously, Innanini is just not relevant. In addition, Claim 1 calls for the generating of a plurality of displays at the remote site and a

10   display sign which may be located at a substantial distance from the display generating means at the remote source. One could argue that there is an issue over the true meaning of a substantial distance. However, it is to be noted in Malec, et al '064 that the display sign can never be very far from the transmitter or else

15   there would be numerous problems of interference and the mere fact that the display sign would not pick up the transmitted signal. Consequently, it is respectfully urged that these limitations are not met by the art of record.

Claim 1 also calls for the flat panel display screen. By

20   definition, each of the prior art references cited in this application are completely devoid of any such teaching. Claim 1 further calls for the computer operated processing means in the display sign. In Malec, et al and, for that matter, in Amo, et al and Dumond, et al, it is urged that there is no computer system

25   mounted within the display itself. Indeed, in Amo, et al, which is operated in a particular facility, the various displays are all

21

DA000103

connected to the central source and there would be no need for a computer operated system in each individual display in Amo, et al. Each display is presenting essentially the same information and therefore it is not relevant. In like manner, and with the display

5    of Dumond, et al, each of the cabs or other transit vehicles are similarly presenting the same information.

It is also to be noted in connection with the present invention that a display at one fixed display screen can be different than the display at another fixed display screen. As

10    indicated previously, Amo, et al and Dumond, et al all will present the same displays. With regard to Malec, et al, it is admitted that a display screen on a cart in one isle will have a display different from that on the screen of a cart in another isle. However, those displays are essentially fixed and the same display

15    will be generated continuously from each transmitter as the cart passes by that display. In the case of the present invention, it is possible to monitor from the remote source and merely change those displays from one display sign to the next at will.

One of the most basic differences between the display system

20    of the present invention and that of the prior art is the fact that the display sign literally includes its own computer and receiver for receiving signals from the remote source. The computer system in the display sign will literally use the received electronic signals and reconvert those signals to visible images. Moreover,

25    the computer can be used in each sign to display the image and store the image. In like manner, a plurality of images can be

22

DA000104

presented and stored in the memory of the computer forming part of
the display sign. These features are brought out in Claim 1 but
are not even remotely suggested in the art of record. It is
therefore believed that Claims 1-5 patentably distinguish over the
5    prior art and allowance therefor is respectfully solicited.

Claims 6-9 are more specifically directed to the method of
generating the static displays at the remote source and
electronically transmitting the displays to the display sign. Here
again, it is noted that Claim 6 calls for the fact that the display
10   sign may be located a substantial distance from the remote source.
These claims call for the electronic generation of a plurality of
displays and the converting of these displays in the form of
electronic signals at the remote source. The displays are then
transmitted and stored in an temporary storage at the remote
15   source. Thereafter, the electronic signals are transmitted to the
display sign and literally stored in a memory forming part of the
processing means at the display sign. Thereafter, the computer
system in the display sign will cause regeneration of the
transmitted signals in to visible images and display of same.
20   Again, this is not taught in the art of record. The closest
reference applicable is that of Malec, et al '064. Here again, it
is admitted that Malec, et al can prepare a display at a remote
source and transmit same. However, Malec, et al does not include
a separate processor with each receiver and display screen, as
25   indicated previously. Moreover, even if there were a computer with
every display screen in Malec, et al, which is not the case, there

23

DA000105

is no storage member at the screen in Malec, et al. In effect, Malec, et al is using an entirely different system. Consequently, it is urged that Malec, et al and, for that matter, the other references of record cannot respond to Claims 6-9.

5      The Examiner rejected Claims 1-9 also on the basis of Amo, et al. However, as indicated previously, Amo, et al is quite deficient for the same reasons as previously described. Moreover, in Amo, et al all displays are generated from a central computer 110. Moreover, they are all controlled by that central computer. Consequently, Amo, et al is actually dealing with an entirely different type of system. For these reasons, it is believed that Claims 1-5 and 6-9, particularly as amended, are allowable and allowance therefor is respectfully solicited.

       The applicant has also added new Claims 20-23 which are dependent upon Claim 1 and add further limitations which are not taught by the art of record. For example, and as specified above, there is nothing which responds to the plasma display screen. In addition, Claim 21 calls for the sequencing capability in the processing means of the display sign and, again, the prior art of record is silent on this point. Further, there is nothing in the art of record to call for a memory "at the display means" for storing and controlling a display. As indicated previously, Malec, et al particularly cannot respond to the this limitation. Finally, there is nothing which responds to Claim 23 calling for the back lighted plasma display screen.

24

With regard to the method Claims 6-9, Claims 24-26 are method claims corresponding essentially to Claims 20-22, but which are dependent upon Claim 6. For the same reasons advanced regarding the allowance of Claims 20-22, it is urged that the art of record

5    does not respond to Claims 24-26 and allowance therefor is respectfully solicited.

Claims 10-12 were rejected on the basis of Figure 2 in Malec, et al. Claims 10 and 11 are drawn to that aspect of the system for generating the display in an electronic format at the remote

10    source. Claims 10 and 11 were rejected on the basis the Malec, et al '064 reference. The Examiner correctly notes that Malec, et al fails to disclose the temporary storage and a permanent storage. Indeed, in Malec, et al, the Examiner has had to rely upon the same element to respond to three different components defined in Claim

15    10 of this application. For example, the Examiner had to state that the computer 300 served as the temporary storage means, the computer 300 served as the processing means and the computer 300 served as the permanent storage means. In effect, the Examiner necessarily has to take the position that to combine all three

20    means would be obvious.

By definition, the applicant has a computer available when preparing the electronic signal representative of an image. If the applicant deemed the use of the electronic computer to be feasible for all three components, it clearly would have done so. However,

25    the applicant has found that by using a temporary storage apart from the permanent storage, processing of the image is far easier.

DA000107

Moreover, the permanent storage allows the processing means and the temporary storage means to be used for processing images and not for modifying any stored image. Consequently, it is urged that Malec, et al cannot respond to Claims 10 and 11 and that these

5   claims clearly define subject matter which is not met by Malec, et al. Moreover, the same subject matter is not met by the other references of record. It is therefore believed that Claims 10 and 11 are allowable and allowance therefor is respectfully solicited.

Claims 12-18, which are drawn to the display sign per se, were

10   rejected on the basis of the Dumond, et al '629 patent. Incidentally, the applicant would observe that the copies of the references supplied were marked up with liner but, during the reproduction process, that liner obliterated the language which was highlighted, thereby rendering the same virtually unreadable. The

15   applicant would request in the future the copies of these references without the enhancement or markers thereon.

Notwithstanding the foregoing, and to the extent that applicant is able to read this particular Dumond, et al patent, it would appear as though the processor means 50 is not necessarily

20   mounted within the housing 35. It is apparent that the system in Dumond, et al relies on a cellular transceiver 39. Notwithstanding, Dumond, et al cannot respond to any of Claims 12-18, as now amended, or many of the newly added dependent Claims 27-30 and which are dependent upon Claim 12. In this particular case,

25   Claim 12 has been amended to call for the addition of the power supply located directly in the interior compartment of the housing

26

for operating the processing means and the other electrical
components. In addition, Claim 12 calls for the ventilation means.
It is urged that even if Dumond, et al disclosed the display sign
with the housing, display panel and processor means, Dumond, et al
5    clearly cannot respond to Claim 12 as now amended. In effect,
Claim 12 calls for a fully integrated and complete display sign.
Moreover, Claim 12 further calls for the fact that the processor
means causes generation of a display based on a signal received
from a remote source. It is therefore believed that Claim 12
10   patentably distinguishes over Dumond, et al and any of the other
references of record.

       It is also to be noted that many of the claims dependent upon
Claim 12 call for limitations not taught in the art of record. For
example, there is nothing in any of the references which teach of
15   a chassis for removable insertion into the housing and which
carries a processor means, the power supply and the like. In
addition, there is nothing in the art of record which discloses the
receiver located directly in the housing for receiving a
transmitted electrical signal, the mounting plate on the housing
20   for mounting, and the like. Newly added Claims 27-30 also recite
additional limitations which clearly cannot met by the art of
record. It is therefore believed that these claims patentably
distinguish over the prior art and allowance of Claims 12-19 and
27-30 is respectfully solicited.

25       The applicant has added new Claim 31 which is effectively
Claim 19 in independent form. It was indicated in the office

27

action that Claim 19 contained allowable subject matter and therefore it is believed that Claim 31 is allowable. Applicant has also added new Claims 32 and 33 which are dependent upon Claim 31 and allowance of these claims is also therefore respectfully

5    solicited.

In view of the foregoing, favorable reconsideration and allowance is respectfully solicited.

Dated: _July 14_, 1999

10                          Respectfully submitted,

15    ROBERT J SCHAAP
      Attorney for Applicant
      Registration No. 20,577
      (818) 346-6555

20

ADMEDIA
AMEND-B.456

28